|  |  |
|---|---|
| LAUREL ANNE MOORE, | CIVIL ACTION NO. 6:14-CV-00043 |
| *Plaintiff,* |  |
| v. | MEMORANDUM OPINION |
| LIBERTY LIFE ASSURANCE COMPANY OF BOSTON, |  |
| *Defendant.* | JUDGE NORMAN K. MOON |

This action, removed here pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 ("ERISA"), is before me upon consideration of the parties' cross-motions for summary judgment, which have been briefed and argued.[1]  My review of the record discloses that Plaintiff, formerly a sales associate for Lowe's Home Improvement, received short term disability ("STD") and long term disability ("LTD") payments for two years because she was unable to perform the duties of her "own occupation."  However, the Group Disability Income Policy (the "Policy") provides that, at the end of 24 months, LTD coverage is no longer available if the claimant is capable of "any occupation," and Defendant then determined that, because Plaintiff was capable of performing a sedentary occupation that does not involve driving, she was no longer entitled to LTD benefits.  As explained more fully herein, Defendant's determination is supported by substantial evidence and reflects an appropriate exercise of its discretion as the administrator of the plan.  Accordingly, I will deny Plaintiff's

---

[1] Plaintiff initiated this action in the Circuit Court for Rockbridge County, Virginia; Defendant removed the case to this court because it is an action for plan benefits preempted by ERISA, 29 U.S.C. § 1132, and thus presents a federal question constituting grounds for removal to this Court pursuant to 28 U.S.C. §§ 1331, 1441, & 1446.

motion for summary judgment and grant Defendant's motion for summary judgment.

## I.

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In order to preclude summary judgment, the dispute about a material fact must be "'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also JKC Holding Co. v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). However, if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250. In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See*, *e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

When faced with cross-motions for summary judgment, the standard is the same. The court must consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quotations omitted). If the court finds that there is a genuine issue of material fact, both motions must be denied, "[b]ut if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." *Trigo v. Travelers*

*Commercial Ins. Co.*, 755 F. Supp. 2d 749, 752 (W.D. Va. 2010).  The mere existence of "*some*"

factual disputes will not defeat summary judgment; the dispute must be "genuine" and concern

"material" facts.  *Anderson*, 477 U.S. at 247–248; *see also Emmett v. Johnson*, 532 F.3d 291,

297 (4th Cir. 2008).  Only legitimate disputes over facts that might affect the outcome of the suit

under the governing law fall within that category.  *Id.*; *see also Fields v. Verizon Servs. Corp.*,

493 Fed. App'x 371, 374 (4th Cir. 2012).


## II.[2]

### A.

Liberty Life Assurance Company of Boston ("Defendant," or "Liberty") issued the

Policy to Lowe's Companies, Inc. ("Lowe's").  L001.  LTD benefits are payable under the

---

[2] The facts have been adduced from the administrative record, which is paginated L001 through L1196.  The relevant facts are uncontroverted.

Plaintiff attempted to expand her arguments on summary judgment with matters outside the administrative record (indeed, so far outside the record that some of Plaintiff's documents post-date the complaint).  Plaintiff contended that she had provided "information that Liberty knew was coming," but she failed to cite to any entry in the administrative record or to make any other showing that would support that assertion.  As I pointed out in my order of August 12, 2015, wherein I allotted Plaintiff fourteen days within which to re-file her motion for summary judgment and her response in opposition to Defendant's motion for summary judgment with the revised filings omitting all reference to material outside the administrative record, consideration of evidence outside the administrative record in ERISA cases is generally "inappropriate when a coverage determination is reviewed for abuse of discretion," *Helton v. AT&T Inc.*, 709 F.3d 343, 352 (4th Cir. 2013) (citing *Sheppard & Enoch Pratt Hosp. v. Travelers Ins. Co.*, 32 F.3d 120, 125 (4th Cir. 1994); *Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 788 (4th Cir. 1995)), although a district court may consider such evidence when it is "necessary to adequately assess the *Booth* factors and the evidence was known to the plan administrator when it rendered its benefits determination," *id.* at 356 (citing *Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342-43 (4th Cir. 2000)).  For example, "an ERISA plan administrator can be charged with knowledge of information acquired by its employees in the scope of their employment and the contents of its books and records," *id.*; however, notwithstanding that a determination whether a court can consider extrinsic evidence is "focused on whether evidence was known to the administrator when it rendered its decision, not whether it was part of the administrative record," *Helton*, 709 F.3d at 352, there must be a "showing that this evidence was known to the Plain Administrator at the time it rendered its decision," *Stump v. Wachovia Group Long Term Disability Plan*, Civil Action No. 7:13-cv-00462, 2014 WL 4923223 at *9 (September 30, 2014) (citing *Webster v. Black & Decker (U.S.) Inc.*, 33 F. App'x 69, 74 n. 6 (4th Cir. 2002) (declining to consider Social Security Administration benefits determination letter that was not part of the administrative record)).

Policy "[w]hen Liberty receives Proof that a Covered Person is Disabled due to Injury or Sickness and requires the Regular Attendance of a Physician . . . ." L022. "The benefit will be payed for the period of Disability if the Covered Person gives to Liberty Proof of continued: 1. Disability; 2. Regular Attendance of a Physician; and 3. Appropriate Available Treatment." *Id*. "The Proof must be given upon Liberty's request and at the Covered Person's expense," *id*., and "Liberty reserves the right to determine if the Covered Person's Proof . . . is satisfactory," L043.

The Policy includes pertinent definitions. For example, it states that

"**Disability**" or "**Disabled**", with respect to Long Term Disability, means:

i. if the Covered Person is eligible for the 24 Month Own Occupation benefit, "**Disability**" or "**Disabled**" means during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and

ii. thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.

L007. The Policy defines "'**Material and Substantial Duties**', with respect to Long Term Disability," as "responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other Occupation, and cannot be reasonably eliminated or modified." L009. "'**Any Occupation**' means "any occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical or mental capacity." L006. "'**Covered Person**' means an Employee insured under this Policy." L007. "'**Employee**' means a person in Active Employment with [Lowe's]." L008.

The Policy's termination provisions states that "[a] Covered Person will cease to be insured on the earliest" of a list of dates, including "the date the Covered Person is no longer in

-4-

an eligible class" and "the date employment terminates."  L039.

The Policy provides that part of Defendant's calculation "[t]o figure the amount of" the LTD monthly benefit will "[d]educt Other Income Benefits and Other Income Earnings" that it estimates are payable to a Covered Person.  L022.  Other Income Benefits include "[t]he amount of Disability and/or Retirement Benefits under the United States Social Security Act[.]  L029. Under some circumstances, benefits will not be reduced, including "if the Covered Person . . . provides proof of application for Other Income Benefits" and, "if applicable, provides satisfactory proof that all appeals for Other Income Benefits have been made on a timely basis . . . ."  L031.

The Policy provides the following grant of discretionary authority to Defendant: "Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding."  L042.

### B.

Plaintiff worked as a Sales Specialist for Lowe's.  In 2011, she submitted a claim for STD benefits based on severe back pain and digestion problems.  L055; L1193-L1196. In response, Defendant requested and obtained certain records from her treating physician. L1177-L1150; L1183-L1186.  On or about October 21, 2011, Defendant made an initial determination that Plaintiff was not eligible for STD benefits. L053; L1148-L1150.

By December of 2011, Plaintiff had applied for Social Security disability benefits ("SSDB").  L082.  That same month, Plaintiff, through a lawyer, requested that Defendant review its decision to terminate STD benefits, and she provided additional medical records. L051-L052; L990-L1142.  By letter dated February 2, 2012, Defendant reversed its decision and

-5-

awarded Plaintiff STD benefits through the maximum allowed time period. L048; L990. On February 6, 2012, Plaintiff was discharged from physical therapy, which had begun on December 1, 2011. L802-L809.

On February 7, 2012, Defendant notified Plaintiff that it would review her claim for consideration under Lowe's LTD coverage, and informed Plaintiff that the provisions and requirements in that coverage differed from those in the STD coverage. L981-L982. Defendant requested that Plaintiff complete various forms, including an Activities Questionnaire, a Claimant Supplementary Statement, a Claimant Information form, an Authorization to Release Information, and a Training Education and Experience form. *Id.*

On February 17, 2012, Defendant informed Plaintiff that she was eligible to receive LTD benefits under the "own occupation" definition of disability. L966. Defendant further informed Plaintiff that, should her "disability be expected to extend for twelve months," the Policy required her to apply for SSDB. L968.

Plaintiff completed and returned to Defendant the Activities Questionnaire, the Claimant Supplementary Statement, the Claimant Information form, the Authorization to Release Information, and the Training Education and Experience form. L954-L965. She identified her treating doctors, who included Dr. Laura Kornegay, an internal medicine specialist. L956-L957. In March of 2012, Defendant received medical records and information from Dr. Kornegay. L875-L944.

In April of 2012, Defendant sought an Independent Peer Review. L873-874. Michael Y. Chang, O.D., conducted the review. L862-L868. Dr. Chang is an osteopathic physician, board certified in physical medicine and rehabilitation, and also board certified in pain medicine. *Id.*

-6-

Dr. Chang contacted Dr. Kornegay, and in his report of April 19, 2012,[3] Dr. Chang concluded that Plaintiff had a sacroiliac joint dysfunction that would cause her to have some work restrictions at all times, such as being restricted from lifting greater than 10 pounds. L864. Dr. Kornegay agreed with this work restriction. L859-L860. Plaintiff's Sales Specialist position at Lowe's required that she lift or move up to 200 lbs, and Defendant continued to provide Plaintiff with LTD benefits. L1193.

As of April 18, 2012, Lowe's had terminated Plaintiff's employment. L083.

In July and September of 2012, Defendant issued multiple requests for medical records from doctors Plaintiff had identified as having provided treatment and diagnoses to her. L810-L857. On July 26, 2012, Plaintiff informed Defendant that her application for SSDB had been denied, but that she was seeking a reconsideration of her claim. L080. She was enrolled as an online student at Colorado Technical University, L775-L778, "trying to get [a] bachelor[']s degree in criminal justice so that she [could become] a counselor and advocate to victims of abuse," L080 (capitalization omitted). She was working on seven or eight classes, and her academic activities occupied "prob[ably] 15-20 hours a week." *Id*. (capitalization omitted).

In September 2012, Defendant continued to seek medical records from Plaintiff's treating physicians. L737-L774. Dr. Carmouche, an orthopedic and spine doctor, submitted a Restrictions Form, in which he deferred to another doctor. L736. Later, Dr. Carmouche submitted another Restrictions Form, dated December of 2012, in which he noted that Plaintiff suffered from back pain, but he did not list any restrictions or limitations. L676. From December of 2012 through January of 2013, Defendant requested and received various medical

---

[3] Plaintiff states that "Liberty relied on a records review by an unidentified physiatrist completed on April 19, 2012."

records relating to Plaintiff.  *See generally* L518-L662.  In June 2013, Plaintiff's pain management providers declined to provide Defendant with any restrictions or limitations for Plaintiff.  L517.

In a letter dated June 26, 2013, Defendant informed Plaintiff that, to remain eligible for benefits beyond 24 months, she must be disabled from "any occupation."  L472.  Because her LTD benefits had begun on December 7, 2011, the change in the applicable definition from "own occupation" to "any occupation" would occur on December 6, 2013.  *Id*.  As a result, Defendant was gathering information to assess her continued eligibility for benefits beyond that date, including contacting her treating physicians.  *Id*.  Defendant informed Plaintiff that, if she had changed physicians or had been treated by other physicians in the previous twelve months, she needed to provide the full names and mailing addresses of any such provider.  *Id*.  Plaintiff was also asked to complete and return an Activities Questionnaire, a Claimant Information Form, and a Claimant Supplementary Statement, which she did.  L463-L472.

Plaintiff identified the following doctors:  Dr. Kornegay; Dr. Raju, who she identified as a pain management specialist; Dr. Ung, also identified as a pain management specialist; Dr. Peery, identified as a spine specialist; and Dr. Joiner, another pain management doctor.  L468-L469.  She stated further that she had an appointment with a cardiologist, Dr. Todd.  *Id*.

Defendant requested that Dr. Ung, Dr. Raju, Dr. Perry, Dr. Carmouche, and Dennis Duncan (a physician assistant, or "PA") provide updated medical information, L450-L453, and it received medical records from Dr. Ung, Dr. Teja Raju, and the PA, Mr. Duncan.  L412-L421.  Dr. Perry sent in a Restrictions Form dated July 17, 2013, in which he indicated that he had not treated Plaintiff since September of 2012, and that he had imposed no restrictions.  L342.

Defendant also requested that Dr. Kornegay and Dr. Todd complete Restrictions Forms

-8-

and provide updated medical records. L458; L440; L423-L424. Dr. Todd provided copies of medical records, L397-L410, and sent in a Restrictions Form dated July 10, 2013, noting that Plaintiff was capable of sedentary work, but should not drive or stand on ladders, L411.

Dr. Kornegay provided copies of medical records, L354-L395, most recently dated June 28, 2013. The appointment that day was set up to perform paperwork for her disability application, but Plaintiff "had multiple other issues of concern." L367. For example, Plaintiff complained about loss of consciousness, but "adamantly declines any evaluation in the emergency room or any hospitalization to further sort things out." *Id.* Plaintiff also said that she heard voices, but knew that they were not real. L368. Dr. Kornegay assessed that Plaintiff had "[q]uestionable auditory hallucinations," and added that she was "[r]eally not know sure at all what to make of this symptom." *Id.* Dr. Kornegay diagnosed "[d]isability secondary to chronic low back issues," stating further that "[t]hese seem essentially unchanged" and that she would "reflect no change in status on [Plaintiff's] disability forms." *Id.* Dr. Kornegay's medical records were accompanied by a Restrictions Form dated June 28, 2013, upon which Dr. Kornegay reported that Plaintiff had low back pain and was capable of sedentary work. L353.

In conversations with Defendant's agents in August and September of 2013, Plaintiff stated that she had been diagnosed with Chiari Malformation, Type 1. L063. She stated that an MRI had revealed this condition, which she described as "a rare and serious neurological disorder where part of the lower . . . brain herniates into [the] neck area."[4] *Id.* (capitalization omitted). Plaintiff stated that she was planning to see either Dr. Edward Oldfield, a professor of

---

[4] Arnold-Chiari deformity is a is a condition in which the inferior poles of the cerebellar hemispheres and the medulla protrude through the foramen magnum into the spinal canal. *Schmidt's Attorneys' Dictionary of Medicine*, J.E. Schmidt, M.D., 1993, Volume 1, at A-356.

neurology and internal medicine at the University of Virginia ("U.Va."), or a Dr. Henderson in Maryland.  L063-L064.  She later reported having appointments with Dr. Oldfield and Dr. Campa at U.Va.  L063.  Plaintiff also said that her Social Security claim had been denied, but she planned to appeal with the new information about Chiari.  *Id.*

On October 3, 2013, Defendant asked Dr. Kornegay for records since July 7, 2013. L244.  It also requested recent records and completed Restrictions Forms from Drs. Campa and Oldfield.  L238; L232.  Dr. Kornegay provided a copy of an August 16, 2013, MRI report from the Carillion Clinic in Lexington, Virginia, stating "[t]here are criteria for Chiari I malformation fulfilled because of projection of the tonsils just below the foramen magnum," which "crowds the [cerebrospinal fluid] space but does not eliminate it or cause compression or occlusion of the vertebral arteries passing across it at the ventral aspect of the brainstem."  The report added that "[t]here is visible anterior [cerebrospinal fluid] space anterior to the brainstem," that all other aspects of the MRI were likewise normal, and concluded with the following "<u>IMPRESSION</u>": "CHIARI I MALFORMATION WITHOUT EVIDENCE OF ASSOCIATED VASCULAR OBSTRUCTION OR OTHER SIGNIFICANT FINDING."  L226.  An October 2, 2013 report from Dr. Oldfield at U.Va. stated, in pertinent part, the following:

> she has a *very long list of symptoms . . . .  Most of her symptoms do not have a potential relationship with a Chiari I malformation*.  She had a previous MRI scan that suggested the potential diagnosis of a Chiari I malformation with the cerebellar tonsils slightly below the level of the foramen magnum.  Because of that report she was referred to clarify whether or not she has a Chiari I malformation.  *She has inconsistent neurological findings on her neurological examination which are probably explained by fluctuations in effort.*
>
> Her MRI scan of the cervical spine show that the cerebellar tonsils have a normal rounded shape.  The bottom margin of them is only 1 - 2 mm below the bottom edge of the foramen magnum.  Further, there is a layer of cerebrospinal fluid that can be clearly seen behind the cerebellar tonsils between the posterior margin of the tonsils and the inner layer of dura.  Finally, cine MRI scanning demonstrates

-10-

normal pulsatile movement of the cerebrospinal fluid across the foramen magnum ventrally and dorsally. The findings of the scan are relatively clear. *It does not demonstrate a Chiari I malformation*.

L194 (emphasis added).

In a phone call on October 9, 2013, Plaintiff admitted to one of Defendant's agents that Dr. Oldfield told her that she does not have Chiari malformation, and that none of her symptoms were neurological, "even though she gave him [three] pages of [symptoms] and she [had] done a lot of research on" the subject. L062 (capitalization omitted). Plaintiff stated that she was filing a complaint against Dr. Oldfield, and the agent noted that "she didnt [*sic*] want me to get [Dr. Oldfield's] reports." *Id* (capitalization omitted).

Plaintiff missed her appointment with Dr. Campa, arriving too late to be seen. *Id*. Neither Dr. Campa nor Dr. Oldfield submitted a Restrictions Form. L205-L210. Dr. Kornegay, however, sent in another Restrictions Form dated October 17, 2013, on which she indicated that Plaintiff had low back pain, syncope (which she indicated was "new"), generalized anxiety and an abnormal brain MRI. L192. Dr. Kornegay indicated that Plaintiff would undergo a "psychiatry eval," and that Plaintiff was not to drive pending a neurology evaluation. *Id*. Although Dr. Kornegay noted various symptoms, she provided no other restrictions or limitations and did not opine that Plaintiff is otherwise unable to work in a sedentary capacity. *Id*.

Based on the "sedentary" restrictions and limitations provided by Dr. Todd and Dr. Kornegay in June and July of 2013, and the "no driving" restriction (the only restriction) listed on Dr. Kornegay's Restrictions form dated October 18, 2013, Defendant requested a Transferrable Skills Analysis. L061; L191. Defendant's file on Plaintiff, with its updated medical records, stating specific restrictions and limitations ("R&Ls"), was referred to a

-11-

Vocational Case Manager, Ellen Levine, M.S., C.R.C., C.C.M.. L191; L187. Ms. Levine reviewed all the restrictions and limitations on the three most recent Restrictions Forms, *i.e.*, Dr. Todd's form dated July 10, 2013, and Dr. Kornegay's forms dated June 28, 2013, and October 17, 2013, as well as other documents, including Plaintiff's Training, Education and Experience form. Ms. Levine then identified alternative occupations for which Plaintiff was qualified, based on her training, education, and experience, and which were within the physical capacities for work outlined in the Restrictions Forms.[5] L187-L190.

By letter dated November 12, 2013, Defendant informed Plaintiff that she was not disabled under the "any occupation" definition of disabled in the Policy. L182-L186. Defendant's review of her claim was based on her current restrictions and limitations based on her diagnosis of low back pain, syncope, anxiety, and Chiari malformation. L182. Defendant noted the Restrictions Forms from Dr. Kornegay and Dr. Todd from June and July of 2013, respectively, stating that Plaintiff had sedentary capacity, and that both Dr. Todd and Dr. Kornegay, the latter in an October 18, 2013 Restrictions From, had included a restriction against driving. L184. Defendant pointed out that "the only treating providers restricting [Plaintiff] were [her] primary care physician, Dr. Kornegay and [her] cardiologist, Dr. Todd, with sedentary capacity, no driving or standing on ladders." *Id.*

Defendant explained the results of the Transferrable Skills Analysis. L184-L185. Based on its medical and vocational reviews, Defendant had determined that Plaintiff could perform, with reasonable continuity, the material and substantial duties of the occupations listed in the

---

[5] Although Plaintiff argues that Ms. Levine based her report on "distortions" of Dr. Kormegay's October 17, 2013, Restrictions Form, Plaintiff does not identify any restriction or limitation on that form that Ms. Levine overlooked or did not accurately remark.

-12-

Transferrable Skills Analysis based on her capacity and skill level. L185. Thus, she did not meet the Policy's definition of disability beyond December 6, 2013, and Defendant denied her claim for further benefit consideration. *Id*. Benefits were paid through December 6, 2013. *Id*. Plaintiff was informed of her appeal rights, including that she could submit a "written request for review . . . within 180 days of the receipt of this letter," and of the types of records she should submit with any such appeal. *Id*. Defendant specifically informed Plaintiff that, "[*i*]n [*her*] *request for review*," she could

> *include the following documentation: all office notes, diagnostic test results, operative/procedure reports, treatment plans, restrictions and limitations, hospital records, pharmacy records and/or therapy notes from December 2013 forward from any and all treating providers, **including neurology**; as well as any additional information which you feel will support your claim.*

L185 (bold emphasis added).

More than five months later, by letter from her lawyer dated April 30, 2014, Plaintiff appealed. L155-L156. Attached to the letter were records from Dr. Chinekwu Anyanwu, a cervical spine MRI report, and records from a hospitalization in March 2014. L157-L178.

The first record from Dr. Anyanwu was based on his December 4, 2013, neurological consultation with Plaintiff. Dr. Anyanwu reported that, "following the diagnosis of Chiari 1 malformation, she has realized [t]hat almost all her symptoms are associated with the diagnosis." L158. He noted that "[s]he produced a four page list of her symptoms" and that "[i]t is unclear which symptoms are real or from reading a lot." *Id*. He specifically stated that he "personally reviewed" and that he "agree[d] with [the] report" of the "[r]epeat MRI [of Plaintiff's] brain [dated] 9/25/13," which "showed a cerebellar tonsil 2 mm below [the] foramen magnum," "[n]o syringomyelia in [the] cervical cord," and that the "csf spaces are not affected." He further noted that Plaintiff "wanted to know if she had tethered spinal cord and atlantoaxial dislocation"

-13-

and that she "suspects she may have Ehlers Danlos syndrome," adding parenthetically that "she reports hypermobility of her joint."[6] *Id*. Dr. Anyanwu summarized his impressions, stating that the "[n]eurological exam is non-physiologic in the most part with inconsistent findings." L161. He added that, although Plaintiff "report[ed] several symptoms suggestive of complications of Chiari malformation," it was "unclear if these are all her symptoms as she seemed to have listed every symptom in the Internet."

Of his encounter with Plaintiff in March 2014, Dr. Anyanwu wrote that she complained of a swooshing sound behind the left ear with a gushing sound, but he explained to her that it was not possible based on anatomy. L173. Dr. Anyanwu told her that her symptoms were likely non-physiologic and may be related to an anxiety disorder. *Id*. Plaintiff told him that she "needs documentation that something is wrong." L174.

Defendant sent Plaintiff's appeal to its Appeal Review Unit for an independent review of Plaintiff's claim eligibility. L154.

Subsequently, Plaintiff's lawyer provided Defendant with a copy of a letter from Dr. Fraser Henderson, a doctor in Maryland. L144-L147. The letter states that he saw Plaintiff at the "Neurosurgery Clinic," but does not provide Dr. Henderson's training or expertise. L145. Dr. Henderson wrote the letter on the same day that he saw Plaintiff for the first and only time, which was May 12, 2014.[7] L145. Although Plaintiff states that Dr. Henderson provided a "comprehensive diagnosis of Ehlers Danlos Syndrome," he merely noted that the history Plaintiff had provided is "*suggestive* of Ehlers Danlos syndrome," *id*. (emphasis added), adding

---

[6] Ehlers-Danlos syndrome is any of six inherited disorders of connective tissue. *Schmidt's Attorneys' Dictionary of Medicine*, Volume 2, at E-29.

[7] As of May 12, 2014, it had been two years and eight months since Plaintiff had last worked.

that it was "reasonable to *assume a working diagnosis* of Ehlers Danlos syndrome, hypermobility type," L146 (emphasis added). He acknowledged that Plaintiff "has not been seen by a geneticist," deferring to a geneticist to make a definitive diagnosis of Ehlers Danlos Syndrome. *Id*. Dr. Henderson also stated that certain findings are "*suggestive* of possible tethered cord syndrome." *Id*. (emphasis added). Similarly, he stated that Plaintiff has a "history suggestive of mast cell disorder," but that "[t]his has not been worked up." *Id*.

Dr. Henderson's letter ends with a list of "impressions" (not diagnoses). L147. He observes the need to "[r]ule out tethered cord syndrome" and "[r]ule out mast cell disorder." *Id*. He outlined a six-point plan that included future tests. *Id*. Nonetheless, he proceeded to state that Plaintiff "should be considered 100% disabled," without providing any supporting restrictions and limitations in support of that statement. *Id*. Rather, he stated that, "[o]nce she is able to obtain these tests and come back to me, we will proceed with evaluation." *Id*.

Defendant requested an Independent Peer Review from MES Peer Review Services, which was conducted by Terence McAlarney, M.D., who is Board Certified in Neurology. L128; 132; L136-L138. Dr. McAlarney spoke with both Dr. Kornegay and Dr. Henderson. Regarding the discussion between Dr. McAlarney and Dr. Kornegay, Dr. McAlarney stated that, on June 24, 2014, Dr. Kornegay had "reported that the [Plaintiff] cannot work in any capacity even with safety sensitive restrictions such as no unprotected heights. She has syncope, has been seen by neurologists and neurosurgeons for possible Arnold Chiari Malformation, and has symptoms of a tethered cord. The [Plaintiff] is restricted from driving." L113. Similarly, Dr. McAlarney stated that, on June 24, 2014, Dr. Henderson had

> reported that the [Plaintiff] cannot sustain any type of work. There is a concern for tethered cord syndrome with low back pain, weakness in the legs, numbness, and a neurogenic bladder. [Dr. Henderson had] not seen the MRI of the lumbar

-15-

spine yet. There is foramen magnum stenosis, pain, fatigue, syncope, Ehlers Danlos Syndrome, probably mast cell activation syndrome, and she cannot work for the time being as there are too many things going on.

L111.

Dr. McAlarney submitted a 12-page Peer Review Report (the "Report") dated July 8, 2014, the first two and a half pages of which lists the documents and information that he reviewed, L120-L122, followed by a summary of such records, L122-L126. This summary included a lengthy discussion of Dr. Henderson's impressions of May 12, 2014. L124.

The Report includes the following review question, and Dr. McAlarney's response thereto:

> **1. Does the medical documentation support any diagnoses causing functional impairment from December 7, 2013 to the present? Please explain your medical rationale as to why or why not**.
>
> Laurel Moore is a 52 year old woman with depression with a prior suicide attempt who has also low back pain and has been out of work since 9/7/11. There were minimal degenerative changes on a MRI of the lumbar spine on 10/24/11. An x-ray of the lumbar spine 9/5/12 reported L4-5 degenerative disc disease and facet arthropathy of the lower lumbar spine and lumbosacral junction. She had had MRIs of the brain which report caudal displacement of the cerebellar tonsils, which is reported by the neurologist, Dr. Anyanwu, to be an incidental finding[]. The neurologist also referenced that she has depression and she had nonphysiological findings on her examination. . . .

L126.

Addressing the various assertions put forth by Dr. Henderson, Dr. McAlarney observed in the Report that Plaintiff's

> neurological examinations have been normal until examined by Dr. Henderson on 5/12/14 in a neurosurgical examination who reports that the claimant is now quadriparetic with a slow and unsteady gait, has Ehlers Danlos Syndrome (but has not seen a geneticist), and is concerned about a tethered cord syndrome, though Dr. Henderson has not looked at a MRI of the lumbar spine. Dr. Henderson did order a repeat MRI. The prior MRI in 10/24/11 was essentially negative and there was no tethered cord. Dr. Henderson described the Arnold Chiari

-16-

malformation as being more significant than that described previously by other physicians and Dr. Henderson discussed possible suboccipital decompression. . . .

Regarding the Arnold Chiari malformation, the overall weight of the medical records, would indicate that this is not causing functional impairment and Dr. Oldfield reported that she did not have Arnold Chiari Malformation. There is no associated syrinx. This can be monitored clinically.

Regarding the concern for tethered cord syndrome, the prior MRI from 2011 simply did not report a tethered cord. I do note a repeat MRI of the lumbar spine has been ordered by Dr. Henderson and those results should be obtained.

She is reported in May of 2014 by Dr. Henderson to have weakness of the arms and legs. Tethered cord syndrome would not produce weakness in the arms. Tethered cord can be associated with Ehlers Danlos Syndrome. She has previously been described as having a nonphysiological examination by the neurologist and was reported by Dr. Oldfield in 10/2013 to have an inconsistent examination.

Regarding the loss of consciousness episodes, the neurologist reports that this is not epilepsy and there is a concern for nonepileptic events. She was initiated on Propranolol by Dr. Henderson in May of 2014 for her orthostatic intolerance.

Dr. Henderson also referenced a diagnosis of mast cell release syndrome and initiated Propranolol for orthostatic intolerance. Dr. Henderson does describe in detail findings of Ehlers Danlos Syndrome and the neurologist did previously report hyperflexibility of the joints.

L127. Regarding Plaintiff's capacity to work, Dr. McAlarney opined that,

[b]ecause of the above documentation, neurological restrictions and limitations are indicated:

From December 7, 2013 to the present she can sit for 8 hours in an 8 hour day, but would require the opportunity to change positions approximately every 45 minutes for a duration of 3 to 5 minutes. She can exert up to 10 pounds of force occasionally and/or negligible amounts of force frequently or constantly to lift, carry, push, pull or otherwise move objects. She can stand frequently and walk occasionally.

Safety sensitive restrictions and limitations are indicated in that she should avoid activities in which a sudden loss of consciousness would be dangerous to herself or others i.e. no Driving, no swimming alone, no climbing ladders/unprotected heights etc.

-17-

She has full time capacity within the above neurological restrictions and limitations. . . .

*Id*.

As Dr. McAlarney is Board Certified in Neurology, he deferred to others on Ehlers Danlos syndrome and depression. *Id*.

After receiving Dr. McAlarney's Peer Review Report, Liberty decided to seek a second peer review, this time by a geneticist. L118-L199. The records on file were provided, and the Independent Peer Reviewer was asked to contact both Dr. Kornegay and Dr. Henderson. *Id*. MES Peer Review Services selected Simeon A. Boyadjiev, M.D., Board Certified in Clinical Genetics, to provide this review. L106; L109. Dr. Boyadjiev is the only doctor Board Certified in Clinical Genetics to have reviewed Plaintiff's situation.[8]

In his Peer Review Report, Dr. Boyadjiev described his conversations with Dr. Kornegay:

> We discussed the health issues of Mrs. Moore. Dr. Kornegay indicated that in her opinion Mrs. Moore does have left SI joint pathology, but she was unsure if any of her other health problems can be explained. She indicated that there are no objective symptoms to corroborate the possible diagnoses of epilepsy, Ehlers-Danlos syndrome, Chiari malformation and pseudotumor cerebra. In Dr. Kornegay's opinion Mrs. Moore is not significantly debilitated, but she deferred this to a physician with experience in physical medicine and rehabilitation.

L102. Regarding Dr. Henderson, after relating that he had tried several times to reach him by phone, Dr. Boyadjiev wrote the following:

> Dr. Henderson called me at 11:00 AM PST on 07/23/2014 and briefly discussed the claimant with me. He had vague recollection of possible abnormal brain MRI of Mrs. Moore but was not sure if she has Chiari malformation. He stated that he

---

[8] Although Plaintiff describes Dr. Henderson as the "appropriate specialist" to determine her disability, his credentials are unknown. However, given his acknowledgment that Plaintiff "has not been seen by a geneticist," it is known that Dr. Henderson is not a geneticist. L146.

will review her records and call me back the same day, however he did not call back.

L102.

In addition to his consultations with Dr. Kornegay and Dr. Henderson, Dr. Boyadjiev reviewed 776 pages of medical documentation, disability review reports, legal correspondence, and Defendant's documents relevant to Plaintiff's disability claims by Plaintiff. *Id.* His list of records included Liberty Mutual Independent Evaluation Peer Reviews (from Dr. Chang in April 2012, and from Dr. McAlarney in July 2014). L101. And, as observed above, Dr. McAlarney's Independent Peer Review included a lengthy discussion of Dr. Henderson's impressions, reported in a letter dated May 12, 2014. Further, Dr. Boyadjiev's Peer Review Report demonstrates that he reviewed more documents than he listed separately, as he discusses the 2013 and 2014 records from Dr. Anyawu as well as the repeat MRI study from January 14, 2014, which did "not indicate that the Chiari I malformation was present." L104.[9]

Dr. Boyadjiev's Report includes his responses to the following review questions:

**1. Does the medical documentation support any diagnoses causing functional impairment from December 7, 2013 to the present? Please explain your medical rationale as to why or why not.**

The provided documentation does not support the diagnosis of degenerative disk disease, Chiari malformation, or Ehlers-Danlos syndrome. Ehlers Danlos syndrome presents with multiorgan symptoms which include but are not limited to skin fragility, mitral valve prolapse, myopia and vascular incidents which are not present in this claimant's clinical presentation.

\* \* \* \*

---

[9] Plaintiff objects that Dr. Boyadjiev's list of records reviewed did not specifically include Dr. Henderson's letter dated May 12, 2014, records from Dr. Anyanwu, or the MRI of January 14, 2014. However, as explained above, the balance of Dr. Boyadjiev's Peer Review Report demonstrates that Dr. Boyadjiev spoke to Dr. Henderson, had access to a summary of Dr. Henderson's letter in Dr. McAlarney's Peer Review Report, and did review the records from Dr. Anyanwu and the record of the MRI performed on January 14, 2014.

-19-

**3. When clarifying the supported restrictions, please be sure to address sustained capacity for full time work.**

From my perspective as it relates to possible Ehlers Danlos syndrome, no restrictions and/or limitations are supported within a sustained full-time capacity.

L104-L105.

After reviewing the two Independent Peer Reviews, Defendant upheld its earlier decision to deny Plaintiff's claim for benefits under the "any occupation" standard. L056. Defendant noted Dr. McAlarney's observation about possible diagnosis of depression, but Plaintiff had never provided any treatment records regarding any mental or nervous condition, so there was no way for Defendant to assess any mental restrictions or limitations, or to determine whether Plaintiff was receiving appropriate treatment. *Id.*

In a nine page letter dated August 1, 2014, Defendant explained its decision in detail to Plaintiff. L091-L100. Defendant quoted the relevant provisions from the Policy, L092-L093, and then reviewed Plaintiff's claim and the earlier claim determination, L093-L095. Regarding Plaintiff's appeal, Defendant provided a lengthy discussion of the Peer Review Reports. L096-L098. After quoting from Dr. McAlarney and Dr. Boyadjiev, Defendant noted that, "[w]ith regard to any Mental Illness impairment, Ms. Moore has not provided any treatment records documenting she was treated for any mental illness on or before December 6, 2013, which would allow us to assess if any diagnoses requires restrictions and limitations or is being appropriately treated." L099. The letter concluded as follows:

We do understand Ms. Moore continues to experience symptoms associated with her condition beyond December 6, 2013. We also understand Ms. Moore's symptoms may result in some degree of functional impairment and may preclude her from performing some occupations; however, the available information does not contain exam findings, diagnostic test results or other forms of objective medical evidence substantiating that Ms. Moore's symptoms remained of such severity that they resulted in restrictions or limitations rendering her unable to

-20-

perform the duties of Any Occupation after that date.

Having carefully considered the information submitted in support of Ms. Moore's claim, our position remains that Proof of Ms. Moore's continued disability in accordance with the Policy provisions after December 6, 2013 has not been provided, and our original determination to deny benefits is upheld.

L099.

The instant litigation ensued.

### III.

### A.

In enacting ERISA, Congress established procedural safeguards to ensure that fiduciaries would administer employee benefit plans "solely in the interest of the participants and beneficiaries." 29 U.S.C. §§ 1104(a)(1) & 1001(b); *see also Makar v. Health Care Corp. of the Mid-Atlantic*, 872 F.2d 80, 83 (4th Cir. 1989). When reviewing a plan administrator's decision, courts should be guided by principles of trust law and "in doing so, it should analogize a plan administrator to the trustee of a common-law trust; and it should consider a benefit determination to be a fiduciary act (*i.e.*, an act in which the administrator owes a special duty of loyalty to the plan beneficiaries)." *Metropolitan Life Insurance Company v. Glenn*, 554 U.S. 105, 109-10 (2008). Trust law principles require courts to review a denial of plan benefits *de novo* unless the plan provides to the contrary. *Id.* When, as is the case here, a plan grants the administrator discretionary authority to determine eligibility for benefits, "a deferential standard of review [is] appropriate." *Id.* Nevertheless, that standard must be modified when the administrator is acting under a conflict of interest; if the administrator is acting under a conflict of interest, "[t]rust law continues to apply a deferential standard of review . . . while at the same

time requiring the reviewing judge to take account of the conflict when determining whether the trustee, substantively or procedurally, has abused his discretion." *Id.* at 2350.

In determining whether a fiduciary of an employee benefits plan covered by ERISA has abused its discretion in making a decision, a court may consider, but is not limited to, such factors as (1) the language of the plan, (2) the purposes and goals of the plan, (3) the adequacy of the materials considered to make the decision and the degree to which they support it, (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan, (5) whether the decision-making process was reasoned and principled, (6) whether the decision was consistent with the procedural and substantive requirements of ERISA, (7) any external standard relevant to the exercise of discretion, and (8) the fiduciary's motives and any conflict of interest it may have. *Booth v. Walmart Stores, Inc. Associates Health and Welfare Plan*, 201 F.3d 335, 342-43 (4th Cir. 2000); Employee Retirement Income Security Act of 1974, § 502(a)(1)(B), 29 U.S.C.A. § 1132(a)(1)(B). Courts must not "deviate from the abuse of discretion standard," but should apply the

> abuse of discretion standard according to a sliding scale. The more incentive for the administrator or fiduciary to benefit itself by a certain interpretation of benefit eligibility or other plan terms, the more objectively reasonable the administrator or fiduciary's decision must be and the more substantial the evidence must be to support it.

*Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 233 (4th Cir. 1997). The modified standard deviates from the usual abuse of discretion review "only to the extent necessary to counteract any influence unduly resulting from the conflict [of interest]." *Id.*

When reviewing the discretionary decision of a plan administrator to deny employee benefits, judicial review is limited to the body of evidence before the administrator at the time it rejected the claim. *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 608-09 (4th Cir. 1999). A Plan

-22-

Administrator's decision will not be disturbed if it "is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (citation omitted), and consists of "more than a mere scintilla of evidence but may be somewhat less than a preponderance," *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). To determine whether an administrator's decision was reasonable and based on substantial evidence, the Court may consider the non-exhaustive list of eight factors set forth by the United States Court of Appeals in *Booth*, 201 F.3d 342-43.

## B.

The Policy here expressly establishes Defendant's "authority, in its sole discretion, to construe the terms of this policy and to determine eligibility under it," *see, e.g,. Thomas, supra*, 226 F. Supp. 2d at 742 (citations omitted) (observing that such language confers discretion), and the parties agree that the abuse of discretion standard applies. "A federal court's ability to review a discretionary decision of the administrator of an employee benefits plan is significantly limited." *Elliott, supra*, 190 F.3d at 605. "Under the abuse-of-discretion standard, we will not disturb a plan administrator's decision if the decision is reasonable, even if we would have come to a contrary conclusion independently." *Williams v. Metropolitan Life*, 609 F.3d 622, 630 (4th Cir. 2010) (citing *Ellis*, 126 F.3d at 232). Thus, courts may not substitute their "own judgment in place of the judgment of the plan administrator." *Id.* (citing *Berry v. Ciba–Geigy Corp.*, 761 F.2d 1003, 1008 (4th Cir.1985)); *see also Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 321 (4th Cir. 2008) ("At its immovable core, the abuse of discretion standard requires a reviewing court to show enough deference to a primary decisionmaker's judgment that the

-23-

court does not reverse merely because it would have come to a different result in the first instance.").

Furthermore, the claimant in an ERISA case bears the burden to show that she is disabled within the terms of the relevant policy. *See, e.g., Sara Lee Corp*, 190 F.3d at 603 ("The burden of proving the disability is on the employee."); *see also Thomas v. Liberty Life Ass. Co. of Boston*, 226 F. Supp. 2d 735, 744 (D. Md. 2002) ("Under the [Liberty] Policy at issue, it is the claimant's burden to present competent proof of his continued disability"). Generally, there are two types of disability coverage. "An 'occupational' disability policy provides benefits if the claimant is unable to perform his *regular* job; a 'general' disability policy provides benefits if the claimant is unable to perform *any* job for which he is qualified." *Dewitt v. State Farm Insurance Companies Retirement Plan*, 905 F.2d 798, 802 (4th Cir. 1990). "The difference between the two is substantial." *Id*. In the present case, the Policy provided "general" disability coverage for Plaintiff for two years. However, by December of 2013, Plaintiff was entitled to continued coverage only if she were "unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation." Defendant determined that Plaintiff did not meet that standard and, as shown herein, my review confirms that Plaintiff has not met her burden to show that she is entitled to continued LTD coverage.

## IV.

Not all of the *Booth* factors are relevant in every instance. *See Champion v. Black & Decker (U.S.) Inc.*, 550 F.3d 353, 361 (4th Cir. 2008). Of the eight nonexclusive *Booth* factors, three have relevance to this case: (1) whether the decision-making process was reasoned and principled; (2) the adequacy of the materials considered to make the decision and the degree to

-24-

which they support it; and (3) the fiduciary's motives and any conflict of interest it may have. *Booth*, 201 F.3d at 342-43. As discussed below, my consideration of these factors supports Defendant's decision.[10]

### A.

My review of the record, set forth above, discloses that Defendant's determination that Plaintiff is able to perform the material and substantial duties of "Any Occupation" was the result of a deliberate and principled reasoning process. Defendant's handling of Plaintiff's claim spans three years and an exhaustive record, including the following: a reversal of an initial denial or STD benefits, which resulted payment of STD and LTD benefits to Plaintiff for more than two years; soliciting and consideration of Plaintiff's medical records, and renewed input from Plaintiff's treating physicians; three Independent Peer Reviews; and a Transferable Skills Analysis.

Plaintiff disputes that the decision was the result of a deliberate and principled reasoning process, claiming that the Transferable Skills Analysis was based "upon a few words" and that Defendant withheld material from her. But the claim file, with its updated medicals stating clear restrictions and limitations, had been transferred to the Vocational Case Manager, who reviewed all the restrictions and limitations on the three then-current Restrictions Forms. As Defendant later pointed out to Plaintiff, "the only treating providers restricting [Plaintiff] were [her] primary care physician, Dr. Kornegay[,] and [her] cardiologist, Dr. Todd, with sedentary

---

[10] The remaining *Booth* factors are (1) the language of the plan; (2) the purposes and goals of the plan; (3) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; and (5) any external standard relevant to the exercise of discretion. *Booth*, 201 F.3d at 342-43. The parties' arguments do not raise these factors, and they are not relevant here. To the extent that Plaintiff relies on "the Ehlers Danlos Foundation website" for "external standards," that is not proper evidence in this case, as previously noted. *See supra* note 2.

capacity, no driving[,] or standing on ladders." L184. Finally, as part of her appeal, Plaintiff had an opportunity to have another transferable skills analysis performed, but did not do so.

Plaintiff asserts that "Dr. Boyadjiev's report should embarrass both himself and Liberty," basing these strong words on her misbelief that Dr. Boyadjiev did not review the contents of Dr. Henderson's letter dated May 12, 2014, the records of Dr. Anyanwu, or the MRI of January 14, 2014. However, Dr. Boyadjiev reviewed 776 pages of medical documentation, including Dr. McAlarney's Independent Peer Review, which included a lengthy discussion of Dr. Henderson's letter. Moreover, Dr. Dr. Boyadjiev spoke on the phone with Dr. Henderson and, in his Peer Review Report, Dr. Boyadjiev discussed the 2013 and 2014 records from Dr. Anyawu as well as the repeat MRI study from January 14, 2014, the latter of which did not indicate the presence of any Chiari I malformation. Finally, Dr. Boyadjiev was Board Certified in Clinical Genetics, whereas Dr. Henderson was not.

Plaintiff argues that "Dr. McAlarney refers to a suicide attempt by claimant and defers 'to the appropriate specialist' regarding her psychiatric state, but no psychiatric records as such appear in the Administrative Record." However, Plaintiff never submitted any claim based on a psychiatric disorder, and the administrative record shows that at no time was Defendant provided with the name of a treating psychiatrist, informed that a psychiatric evaluation ever took place, or given a copy of any psychiatric record. Defendant was never put on "notice that readily-available evidence exist[ed] that might confirm claimant's theory of disability" based on her psychiatric status, *Harrison v. Wells Fargo Bank*, 773 F.3d 15, 24 (4th Cir. 2014), the Plan Administrator does not bear the burden of proving a claimant's disability, *see, e.g., Sara Lee Corp*, 190 F.3d at 603 ("The burden of proving the disability is on the employee."); *see also Thomas v. Liberty Life Ass. Co. of Boston*, 226 F. Supp. 2d 735, 744 (D. Md. 2002) ("Under the

-26-

[Liberty] Policy at issue, it is the claimant's burden to present competent proof of his continued disability"), and "a plan administrator is under no duty to secure specific forms of evidence," *Elliott, supra*, 190 F.3d at 609. *See also Piepengarten v. Old Dominion Freight Line, Inc.*, 395 Fed. App'x 950, 957 (4th Cir. 2010) (citation omitted) ("a plan administrator has no duty to develop evidence that a claimant is not disabled prior to denying benefits"). It is fair to say that Defendant had no duty to scour the record for reasons (attenuated reasons, at that) to keep Plaintiff on LTD.

Plaintiff asserts that Defendant should defer to her doctors, especially Dr. Henderson, because they have "met, examined, questioned, palpated, [and] observed" her. But a claims administrator is "not obliged to accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). "[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Id*. at 834. As the Supreme Court explained,

> the assumption that the opinions of a treating physician warrant greater credit than the opinions of plan consultants may make scant sense when, for example, the relationship between the claimant and the treating physician has been of short duration, or when a specialist engaged by the plan has expertise the treating physician lacks. And if a consultant engaged by a plan may have an "incentive" to make a finding of "not disabled," so a treating physician, in a close case, may favor a finding of "disabled."

*Id*. at 832. *Cf.*, *Eastover Mining Co. v. Williams*, 338 F.3d 501, 510 (6th Cir. 2003) ("treating physicians may have strong pro-claimant biases and lack the expertise held by non-treating doctors") (citing *Nord*, 538 U.S. at 832). In the present case, the relationship between Plaintiff and Dr. Henderson was of short duration – one visit – and Dr. Boyadjiev, who was Board

-27-

Certified in Clinical Genetics, possessed the expertise to opine on Ehlers Danlos syndrome, and Dr. Henderson did not.

Plaintiff argues that her doctors "repeatedly call[ed] for additional testing"; that Defendant "ignored multiple suggestions of additional testing" and "closed the Administrative Record as soon as its reviewer, Dr. McAlarney submitted his review"; and "failed to give claimant the opportunity to obtain the testing recommended by her treating physicians, as well as its second peer reviewer (who deferred to the 'appropriate specialist[s]') . . . ." In the first instance, however, the Policy does not require (or even allow) a deferral of a claim determination based on an assertion that a claimant might need more testing in the future. Rather, the issue is whether a claimant is, as a result of Injury or Sickness, unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation. For Plaintiff, this determination was made as of December 2013. To the extent that Plaintiff contends that Defendant should have arranged for or paid for further testing, it had no such obligation. *See, e.g., Elliott, supra*, 190 F.3d at 609 ("a plan administrator is under no duty to secure specific forms of evidence").

Furthermore, Defendant was aware that Plaintiff might undergo additional testing, and provided her ample additional opportunities to present evidence of the outcomes of such examinations. On November 12, 2013, when Defendant conveyed its initial claim determination to Plaintiff, it noted that Plaintiff had missed an appointment with Dr. Campa, had been unhappy with Dr. Oldfield, and that her next appointment would not be until she had obtained insurance after the first of the year. Defendant informed Plaintiff of her appeal rights in its denial letter, specifically mentioning that, as part of her appeal, Plaintiff could provide notes and diagnostic test results from December 2013 forward from any and all treating providers, "including

-28-

neurology." Plaintiff retained a lawyer and appealed, sending in more medical records five to six months after Defendant's denial, time within which she could have obtained whatever testing she or her doctors deemed necessary.

Moreover, Defendant did not "close" the Administrative Record once it received Dr. McAlarney's Independent Peer Review of July 8, 2014. Rather, once Defendant reviewed Dr. MacAlarney's findings, it requested a further review, this time from a doctor Board Certified in Clinical Genetics, Dr. Boyadjiev. Dr. Boyadjiev's Independent Peer Review is dated July 25, 2014, and Defendant upheld the original determination by letter dated August 1, 2014.

Contrary to Plaintiff's contentions, Dr. McAlarney did not recommend further testing. Instead, he provided the following statement: "Regarding the concern for tethered cord syndrome, the prior MRI from 2011 simply did not report a tethered cord. I do note a repeat MRI of the lumbar spine has been ordered by Dr.. Henderson and those results should be obtained." L127. Dr. McAlarney, a board certified neurologist, deferred to "appropriate specialist[s]" for other conditions, such as Ehlers Danlos syndrome and depression. *Id*. The "appropriate specialist" on Ehlers Danlos syndrome is the geneticist, Dr. Boyadjiev, not Dr. Henderson, and as I have already observed, my review of the administrative record demonstrates that Plaintiff did not provide the name of a treating psychiatrist or any records from any psychiatrist regarding depression or any other psychological disorder.

### *B.*

The materials that Defendant considered in making its benefits decision were more than adequate and, as the following list shows, the administrative record provides strong support for Defendant's decision:

- Plaintiff's pain management providers declined to provide Defendant with

-29-

any restrictions or limitations for Plaintiff.

- Dr. Peery sent in a Restrictions Form dated July 17, 2013, in which he indicated that he had not treated Plaintiff since September of 2012, and that he imposed no restrictions.

- Dr. Todd sent in a Restrictions Form dated July 10, 2013, noting that Plaintiff was capable of sedentary work, but should not drive or stand on ladders.

- Dr. Kornegay's medical records from June 28, 2013, noted disability secondary to chronic low back issues, and she wrote that she would indicate no change in status on disability forms. However, these medical records were accompanied by a Restrictions Form dated June 28, 2013, on which Dr. Kornegay reported that Plaintiff had low back pain and was capable of sedentary work. Dr. Kornegay sent in another Restrictions Form, dated October 17, 2013, on which she indicated that Plaintiff was not to drive pending a neurology evaluation. Although Dr. Kornegay included other symptoms, she provided no other restrictions or limitations and did not opine that Plaintiff is otherwise unable to perform sedentary work. Finally, Dr. Kornegay, who was neither a neurologist nor a geneticist, told Dr. Boyadjiev that she deferred to doctors with more experience or expertise in the relevant fields.

- Dr. Oldfield found that an MRI did not demonstrate Chiari I malformation.

- The Transferable Skills Analysis, performed by Ellen Levine, M.S., C.R.C., C.C.M., a Vocational Case Manager, reviewed all the restrictions and limitations on the only three Restrictions Forms Defndant had recently received, as well as other documents including Plaintiff's Training, Education and Experience form, and identified alternative occupations for which Plaintiff was qualified based on her training, education, and experience, and which were within the physical capacities for work outlined in the Restrictions Forms.

- Dr. Anyanwu's notes from his December 4, 2013 neurological consultation with Plaintiff remarked that, since the diagnosis of Chiari 1 malformation, Plaintiff reported that all her symptoms were associated Chiari 1. She produced a four page list of symptoms, but Dr. Anyanwu observed that it was unclear which symptoms were real or from Plaintiff having researched the issue. Dr. Anyanwu wrote that the neurological exam was non-physiologic for the most part, with inconsistent findings. He also noted that Plaintiff reported several symptoms suggestive of complications of Chiari malformation. However, it was unclear to him if

these are all her symptoms, as she seemed to have listed "every symptom in the Internet." Similarly, at a March 2014 encounter with Plaintiff, Dr. Anyanwu told her that her symptoms are likely non-physiological and may be related to an anxiety disorder.

•   Dr. Henderson wrote a letter on the same day that he saw Plaintiff for the *first and only* time, which was May 12, 2014. He opined that Plaintiff's history is suggestive of Ehlers Danlos syndrome. He thought it was reasonable to assume a working diagnosis of Ehlers Danlos syndrome, but he acknowledged that Plaintiff had not been seen by a geneticist, deferring to a geneticist to make the diagnosis of Ehlers Danlos syndrome. Dr. Henderson also stated that certain findings were suggestive of possible tethered cord syndrome, and that Plaintiff has a history suggestive of mast cell disorder, but that this has not been worked up. Dr. Henderson's letter ends with a list of "impressions," and not diagnoses. Without identifying any restrictions or limitations to support his conclusion, he nonetheless proclaimed that Plaintiff "should be considered 100% disabled." He added that, once Plaintiff had certain tests, she should return so that he could proceed with an evaluation.

•   Dr. McAlarney, an Independent Peer Reviewer board certified in neurology, addressed assertions made by Dr. Henderson in his letter. Regarding Plaintiff's capacity to work, Dr. McAlarney described neurological restrictions and limitations that would allow her to engage in a sedentary occupation.

•   Dr. Boyadjiev, an Independent Peer Reviewer board certified in clinical genetics, concluded that the provided documentation did not support the diagnosis of degenerative disk disease, Chiari malformation, or Ehlers-Danlos syndrome, and that there were no restrictions or limitations supported within a sustained full-time capacity.

Plaintiff asserts that Defendant "used inadequate materials to rebut the conclusions of her treating physicians, Drs. Kornegay and Henderson," but in fact, Defendant presents abundant material to rebut the purported conclusions Plaintiff propounds, including Dr. Kornegay's own conclusions that Plaintiff was capable of sedentary work as long as it did not involve driving or mounting a ladder. Plaintiff contends that the records provided by Dr. Kornegay and Dr. Henderson demonstrate her condition, including "observations of her gait, her extraordinary range of motion, her tenderness, and other objective signs." However, to the extent Plaintiff

-31-

refers to these symptoms as demonstrating that she suffers from Ehlers Danlos syndrome, that diagnosis was rejected by the only board certified clinical geneticist to have looked at Plaintiff's case.

Plaintiff argues that "Dr. Kornegay, as early as February 10, 2012 considered 'some kind of connective tissue disorder.' [L889.] In other words, Dr. Kornegay had Ehlers Danlos syndrome in mind before Drs. Anyanwu and Henderson ever saw the Claimant." However, Dr. Kornegay's notes from that day's examination state, in pertinent part:

> In flipping through her chart (I may have seen her once in the past for something but really have not at all been following her for this particular diagnosis) and *it does not appear that she has had any inflammatory markers or the like done, although it seems **unlikely that she has a connective tissue disorder***.

L888 (emphases added). There is no mention of Ehlers Danlos syndrome, and Dr. Kornegay plainly stated that it was "***unlikely*** that [Plaintiff] has a connective tissue disorder." *Id*. (emphases added). And, as noted above, Dr. Kornegay told Dr. Boyadjiev in July 2014 that there are no objective symptoms to corroborate a possible diagnosis of Ehlers-Danlos syndrome. It takes a great leap of the imagination to conclude from these facts that "Dr. Kornegay had Ehlers Danlos syndrome in mind before Drs. Anyanwu and Henderson ever saw the Claimant."

### C.

Plaintiff's only argument regarding the last relevant *Booth* factor, pertaining to a fiduciary's motives and any conflict of interest it may have, focuses on the Policy's required set-off for any SSDB that Plaintiff might have been eligible to receive.

The case law cited by Plaintiff is inapposite. *See, e.g., Glenn, supra*, 554 U.S. 105, 118 (2008). The precedents all involve claimants whose ERISA disability policies required them to apply for SSDB, and the claimants were awarded SSDB but were then denied ERISA benefits by

-32-

plan administrators. *See, e.g., id.*; *Piepengarten*, *supra*, 395 Fed. App'x at 958 (citing *Glenn*); *Stump v. Wachovia Group Long Term Disability Plan*, 2014 WL 4923223 (W.D. Va. Sept. 30, 2014) (citing *Glenn*, *Piepengarten*). In those cases, it was determined that the eighth *Booth* factor was one that must be taken into account, although it remains that "*conflicts are but one factor among many* that a reviewing judge must take into account" in ERISA cases. *Glenn*, 554 U.S. at 116 (emphasis added).

> *Glenn* pertained to a situation in which
>
> MetLife had encouraged Glenn to argue to the Social Security Administration that she could do no work, received the bulk of the benefits of her success in doing so (the remainder going to the lawyers it recommended), and then ignored the agency's finding in concluding that Glenn in fact could do sedentary work.

*Id*. at 118 (citing *Glenn v. MetLife*, 461 F.3d 660, 666-69 (6th Cir. 2006)). In the present case, however, Defendant never encouraged Plaintiff to argue to the Social Security Administration that she could do no work; Defendant did not receive any benefits from Plaintiff having applied for SSDB; and Defendant did not ignore any finding by the Social Security Administration. Indeed, the last word on the subject in the administrative record is that the Social Security Administration denied Plaintiff's claim for SSDB. To follow Plaintiff's argument to a so-called "logical" conclusion, one would be compelled to conclude that such set-offs stated in a Policy presumptively create a conflict of interest. Such a conclusion stands on its head the prevailing precedent that, "barring proof that the disability standards for social security and the plan in question are analogous, [a court does] not consider [a Social Security Administration, or "SSA"] award in an ERISA case." *Piepengarten*, 395 Fed. App'x at 957; *see also Smith v. Continental Cas. Co*., 369 F.3d 412, 420 (4th Cir. 2004) ("what qualifies as a disability for social security disability purposes does not necessarily qualify as a disability for purposes of an ERISA benefit

plan"); *Elliott, supra*, 190 F.3d at 607 (refusing to consider an SSA disability award where such an award was not binding on the plan and "[t]here is no indication that the definition of 'total disability' under the Plan in any way mirrors the relevant definition under the regulations of the SSA"). Furthermore, it is simply not logical: I cannot conclude that Defendant was influenced by questionable motives or a conflict of interest created by the Policy's stated set-off, when that set-off was not applied to a SSDB that Plaintiff did not receive.

## V.

For the heretofore stated reasons, Plaintiff's motion for summary judgment will be denied, and Defendant's motion for summary judgment will be granted.

The Clerk of the Court will be directed to send a certified copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

Entered this __8th__ day of September, 2015.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

-34-